3258 Sarhan against the Department of Justice. Mr. Reiner. Good morning, Your Honors. May it please the Court, Samuel Reiner on behalf of Robert Sarhan. Let me first please acknowledge the courtesy and cooperation of Mr. Moorha in assisting in the preparation of this appeal. The fundamental issues I tried to highlight in the briefing come down to two or three significant problems. I don't need to repeat, obviously, the standards that would be violated by the MSPB decision. However, the arbitrary and capricious standard, I would consider the two prongs of that test would be met by the opinion. The failure to consider important aspects of a problem or evidence and an explanation contrary to the evidence. And I think both of these are met in the difficulty that the Bureau of Prisons had in articulating what the favor, the alleged favor in this case was. Nobody asked about it. Nobody asked the value of it. Nobody could estimate the value of it. And Mr. Sarhan did not validate it in any significant way. In fact, the inmate that is alleged to have given this ephemeral favor was not an attorney. He was not an attorney. He was a former attorney. And if there's time later to dignify the most minute and I think insignificant of arguments that the MSPB hearing officer talked about, the issue of whether he is a medical doctor, Mr. Davidovic was a lawyer. Let me ask you, there are two pieces of evidence really bearing on this. There's the statement that Mr. Sarhan gave and then there's the Davidovic affidavit. You know, there are some differences there in those statements. But, I mean, the thrust, I guess, of the Bureau of Prisons complaint was what it said was an alleged improper relationship with Mr. Davidovic, namely having him provide legal advice to Mr. Sarhan. The improper relationship to which you refer is that which Lieutenant Wensler, the investigator, alluded, and he sustained it based on what he thought was this interplay. But that's not what Warden Pastrana found. He talked about it in terms of a favor from an inmate, not a relationship and not a compromise. And it must be remembered that Mr. Sarhan, as a physician assistant, is treating most of these prisoners, some of the more difficult cases, including Mr. Davidovic's, who had much further to fall from where he was based on the circumstances of his crime, for depression. And he would have to talk to them and he would have to care for them. He is a caregiver by profession and by the nature of his employment. He was not up in the turrets with the machine guns, if they even have that, and I don't think they do. So his job was to be sensitive. His job was to be caring and to listen for the signs of danger, which he did. Yeah, but, I mean, I guess the complaint here on the part of the Bureau of Prisons was that he went beyond that legitimate role and, in fact, ended in this relationship where he was receiving advice of a legal nature from Mr. Davidovic. I mean, there apparently was, you know, Mr. Davidovic did legal research in the library. He talked to him. He gave him advice on a possible claim against an attorney. There was, I think there was evidence to the effect that he spoke on the phone with Mr. Davidovic's, I'm sorry, Mr. Sarhan's attorney in sort of a three-way conversation. So, I mean, I think that's the complaint. I mean, nobody was saying that Mr. Sarhan did anything improper in terms of his medical side of his work. I think the problem is the inference that they drew ignorantly from those contacts and they just lumped it under the heading of legal advice as though that were some gift like a bicycle or a car or a boat. All of us that are lawyers speak to 100 people a day and do not give legal advice. We have interchanges on various levels. He told Davidovic of his problems. Davidovic told him of his problems. This is a normal interchange and it's a normal mode of discussion between the people that have to care for these prisoners and guard them and the prisoners themselves. And the prisoners have nothing but time to talk. There was no evaluation. There was no articulation of legal advice. In fact, Wensler admitted that he did not find case law, as he found for the other inmates, for Davidovic, the jailhouse lawyer. Wensler said he did not find any case law. Was there evidence in the record, I don't recall seeing it, that Mr. Davidovic was allegedly providing legal advice to inmates in the institution? Precisely there was. In my questioning of Mr. Wensler, Lieutenant Wensler, unfortunately, I should have deposed him had I understood that he had such a role in the decision making. He indicated he went through Davidovic's papers and things and he saw other inmates' information and research. He did case law research for them. He did not do that for Sarhan. Sarhan had an attorney. And this was not an attorney who specialized in his type of problem. Maybe I'm wrong. I thought the Davidovic affidavit or declaration that's in the record said he went into the library and did some research in connection with Mr. Sarhan's legal matter. All that their affidavits agree on, and I don't believe that Davidovic actually said he did research, but what they agree on is that he looked at the statutes. But he didn't do it for Sarhan. He didn't do it for Sarhan. And the other phantasm that has come out of whatever minimal evidence there is, there was a piece of paper that had the famous chicken scratchings, unfortunately. I originated the term. The chicken scratchings, count one, breach of fiduciary duty. That was already in the text. Count two, breach of something else. And it was already in the text. And there was no evidence that he went to Sarhan. You're discussing your view of the evidence, and that's understandable. You're advocating for your client. But the problem we're faced with is we have findings from the board, and it's a difficult standard for you to overcome. I mean, you're doing the best you can. You're making a good case for your client. But the difficulty is that we affirm unless there's a lack of substantial evidence. And substantial evidence, you know what it is. And it's hard to say there isn't that quantum of evidence in this case. Actually, I'm here to try to tell you that there is not. There is not a – this is a scintilla. It is a phantom because nobody, not even the investigator, asked him what it was. What did you gain out of it? Yes, Your Honor, there was an affidavit. And there were denials relating to it. And the administrative judge said that the appellant's assertion that he didn't read it was inherently improbable. And the denials are unworthy of belief. These are credibility determinations. That is correct. However, when we consider the substantiality, we must consider that it takes into account whatever in the record fairly contradicts or detracts from its weight. Mr. Sarhan said he was asked to sign the affidavit. He signed it. He didn't read it. And Lieutenant Wensler does not recall that he read it or made any changes. That denial was determined by the administrative judge not to be credible. We can't really review that, can we? You can because it is contrary to the evidence that the judge had before him. He had a clear, undisputed statement from Sarhan that he did not review or change. But this is an educated person who signed an affidavit. And was that a mistake? It's inherently implausible that an educated person would not read what he signed. I would suggest to you, Judge Lurie, that it's inherently implausible that an educated person would have allowed that ungrammatical, sloppy, ambiguous, and contradictory mess to remain with his name on it. It is clearly more plausible his version of events, and that's what the hearing officer had, the administrative judge had. But we're not in a position to weigh one implausibility versus another implausibility. Correct. That's the problem you have. I agree, but you do have the ability to find that his determination was not supported by substantial evidence. How could, how would any of us, unless we did not change, unless we did not review and just signed as we were ordered to do, how would any of us allow that mess to stand? We would not. He would not have. And he explained he was nervous. He explained he felt intimidated by the accusatory process. He hadn't been through any of this. He's a caregiver, not the machine gunner in the turret. This is not something that he's normally used to going through. And it was an unfounded charge. The worst of the charges was that he threatened Davidic. Nobody found that. Well, Wensler didn't find that. That charge was never brought. I mean, this whole thing started from some, I guess, anonymous allegations that were made. And Wensler, I think when he went to the warden after submitting his report, he found there was no merit. I mean, Davidic said, I wasn't threatened. So that was just… But that's what started the ball rolling. And this is a problem. Well, that and other things, yeah. All right, but it was a snowball effect. Let me ask you, on the point you were discussing with Judge Wooley about the affidavit, and if you can point in the record, what I didn't see in the record was a place where Mr. Sarhan, after he signed the affidavit, and initialed certain parts of it, then said to anyone in the prison, Mr. Wensler or the warden, this affidavit's defective because I was harassed, not harassed, but I was under pressure, I was upset, and so forth. Thank you for that question, Judge. If I'm wrong, let me know. No, you're not wrong. Here's the reason that you're right. Here's the reason that he did not do that. He was not given his affidavit until after his response. He was not given the TAB file, the agency file, before he had to respond to the proposed action. He didn't have his affidavit. He's the only one that testified on that point. He testified clearly. I have a citation. But he knew, though, that he had given the affidavit. He knew, though, that he had given the affidavit. While he was going through the process, the decisional process at the agency, he knew that he had been interviewed. He knew that he had signed a document and initialed certain parts of it, and he had a general sense of what he'd said in it. And he asked for it and didn't get it, but he did not get it before he had to prepare his March 27, 2007 response. Is it his position that there's anything in the affidavit? In other words, is his position that he was under pressure and he was sort of sub salientio coerced? He doesn't say, does he, that anything in there is a misquote. His basic argument is, I was under duress, et cetera, right? What he said, and I think it did upset Judge Votaris, he said, that's not my affidavit. And I would, too. I really wouldn't. I think you would, too. It wasn't his affidavit. Well, no, I understand that. Everyone acknowledges there's some poor grammar in there. But I guess what I'm getting at is I don't recall there being any statements to the effect of him saying, okay, paragraph 6 says this. I didn't say that to Wentzler. I understand him to be saying I was under duress. I'm sorry I didn't make it clear. He didn't have an opportunity to even say that because he didn't have his affidavit. We didn't get it until the MSPB appeal. He didn't have it at the time of the proposal letter. He didn't have it when he prepared his response on March 27th or had his meeting in April. And he may have gotten it after he got the decision for removal, but he didn't have it to say those things. But did he say them before the board? Yes, he did. Did he say duress? I know he said duress. But did he also say, wait a minute, I was under duress and what is stated in paragraph 6 is not what I said? He could not and did not say that in his March 27th written response. And he didn't say it at the meeting because he didn't have the affidavit. That's the reason. But what he did do was he explained his position. But did he say that before the board? Oh, yes. Yeah, that was his testimony. He said there are inaccuracies. Yes. He said that was not, that's what upset Judge Viterra, that's not my affidavit. He said there was inaccuracies. He said it was ungrammatical. It was inconsistent. And there's clear inconsistencies. And to believe one in paragraph 30 and not believe another in paragraph 7 is just, it defies belief. And so I would respect Judge Lori that there is not substantial evidence to conclude that his undisputed version that, look, they told me to sign it. I didn't prepare it. The man over there behind the curtains is doing the typing. And he did it. And was it poor judgment? Was it that he was hungry because he didn't have lunch, that he had to go pick up his son? That's what he says and it's undisputed. Do I understand that he initiated every paragraph twice? Front and back. That's what he was told to do. He follows orders. There are people like that. But if he was ordered to go correct the grammar, to go read through it, to have an opportunity to do this barely 15 minutes before the end of his shift, he would have done it. But he didn't. And there's nobody that says, even Wensler. He's not unequivocal. Wensler says, I just don't remember. He says he was told to sign it and he signed it. And I agree, it's a problem. But they based their whole case on that. And so I would suggest that you must account and that the administrative judge should have accounted for the contradiction that detracts from the alleged weight of that affidavit as weighty as it may seem to be. I would respectfully reserve the rest of my time. Okay. We'll save your rebuttal time. Let's hear from Mr. Bowers. Good morning, Your Honors, and may it please the Court. This Court should affirm the decision of the Merit Systems Protection Board that upheld Mr. Sarhan's removal for three reasons. First, the Board's determination to sustain each of the charges that it did is supported by substantial evidence, most notably the affidavit of Mr. Sarhan that you were discussing previously. Second, the Board's determination that the penalty of removal was appropriate is also supported by substantial evidence. And finally, there are no procedural errors in the agency's handling of this matter. With regards to the actual sustained charges, there is substantial evidence. Well, what about Mr. Reiner's point that he dwelt on some length, that Mr. Sarhan was not given the affidavit that he signed until just prior to the MSPB hearing? In other words, he didn't have it while the matter was in the decisional process before the Bureau of Prisons. Your Honor, I can't speak to exactly when Mr. Sarhan signed the affidavit. The problem with his argument, though, is that the Notice of Proposed Removal, which identified each of the charges that was being brought against Mr. Sarhan, specifically identified that affidavit and specifically identified the statement in that affidavit that served as the basis for the charge. At the very least, in response to that Notice of Proposed Removal, in either his written or his oral response, he could have said, one, I was in a rush, I was forced to initial all this, or at the very least, I can't respond to the basis for these allegations because I haven't seen this affidavit. At no point did he make that statement, either in his written response or in his oral response, and as Your Honor noted in his testimony before the Board, he never said that he had not seen the affidavit when he was providing those responses and said instead he said that I was under duress, I was in a rush. But again, even those statements aren't anywhere in his written or his oral responses to the Notice of Proposed Removal. I also note that he was represented at his interview with Lieutenant Wensler by a union official. There's no indication. There were three people there, Lieutenant Wensler, Mr. Sarhan, and the union official? Correct. And at no point was there any indication by Lieutenant Wensler that the union official had raised any concerns with which the way the affidavit had been prepared. In fact, Lieutenant Wensler unequivocally stated that had the union official had such concerns, he could have simply directed Mr. Sarhan not to sign the affidavit. Obviously, that didn't happen. Not only didn't Mr. Sarhan sign it, as Your Honor noted, he initialed the front and back of each paragraph to indicate that he had reviewed it. Now, the only evidence contradicting the statements in the affidavit, which essentially concedes all of the factual allegations against Mr. Sarhan, is his own testimony that the affidavit was coerced out of him, or he hadn't had a chance to read it and it was improperly prepared. Again, as Your Honors have already noted, the board considered that argument and determined that Mr. Sarhan's testimony was inherently uncredible, that it was simply not credible that an educated man such as Mr. Sarhan, who went to medical school, would just sign off on this piece of paper that contained representations that were being attributed to him without reading it. Well, let me ask you one other thing. It didn't come up in the course of our discussion with Mr. Reiner, but this letter, the alleged letter to the district court judge in Florida in connection with, I guess, Mr. Davidovic had some sort of a motion pending, or Rule 35, reduction of sentence, or something like that. What exactly was that? That was a letter that Mr. Sarhan signed that was found in Mr. Davidovic's possession, but that was never apparently sent? That's correct, Your Honor. It was, Lieutenant Wensler testified that he, after receiving this anonymous email, one of the first things he did was investigate and go through Mr. Davidovic's personal effects, and amongst other things, he found this letter which was addressed to a federal district court judge and signed by Dr. Sarhan, and again, that served as one of the charges for which he was removed. Would you elaborate a little bit on your second point of the penalty? Were there warnings given, or is this considered such an extreme infraction based on the findings, assuming they're accepted, that this is the only reasonable penalty? Yes, Judge Newman. There's nothing in the record to indicate that there were specific warnings given to Mr. Sarhan with regards to the type of actions that served as the basis for his removal. There were annual trainings that were given. Mr. Sarhan received a programmatic statement from the Bureau of Prisons that detailed the conduct that BOP employees were supposed to maintain, but with regards to a specific penalty, the deciding official, Warden Pastrana, testified that this conduct was so egregious and so serious that even though there was no prior history of misconduct in Mr. Sarhan's file, that this conduct alone was sufficient to serve as a basis for removal. In making that decision, Warden Pastrana testified as to his consideration of the Douglas factors. He considered both the fact that Mr. Sarhan had this sort of improper relationship with Mr. Davidovich and was receiving legal advice from Mr. Davidovich to be especially serious. He also considered the fact that Mr. Sarhan was willing to misrepresent his position to a federal district court judge also to be especially serious. And those alone, Warden Pastrana testified, would have served as a basis for removal. Was there a telephone call to Mr. Davidovich's mother? There was also a telephone call to Mr. Davidovich's mother. And Mr. Sarhan has repeatedly said he believed that it was appropriate for him to make that call and that he shouldn't be punished for it. Now, whether or not he believed it was appropriate is— Are calls like that from time to time legitimately made? I mean, in other words, is it the government's position here that if Mr. Sarhan had gotten some kind of approval that this call could have properly been made? Is that the issue? That's correct, Your Honor. There's actually two issues with it. One, these calls can be made under certain circumstances with approval. None was obtained in this case. But second, when a call is made like this without such approval or that is outside the scope of an employee's duties, it has to be reported. It never was in this case. Similarly with that letter that's a written communication that was outside of Mr. Sarhan's duties, the BOP's programmatic standards also require that a communication such as that be reported. That was not either. The failure to report was another specific charge that served as the basis for Mr. Sarhan's removal. And with regards to these charges, especially that phone call, Warden Pastrana, the deciding official, testified as to Mr. Sarhan's ability to be rehabilitated or mitigating factors that might serve in his favor to allow the penalty to be reduced. And he testified that Mr. Sarhan had showed no remorse at any point for his misconduct, either in his communications with Warden Pastrana in response to the notice of proposed removal. He showed no remorse in his testimony before the Board. In fact, with regards to that actual letter, he again stated, I really don't believe I did anything wrong. Now with regards to this letter, which both Warden Pastrana and the administrative judge considered to be especially serious, Mr. Sarhan's reply brief for this court referred to the charges annoying. Annoyingly de minimis was the term that Mr. Sarhan's brief used. Again, this sort of is further evidence of the lack of an understanding of the gravity of these charges and the lack of remorse in responding to them. Judge Newman, to finish my response to your question, Warden Pastrana also testified that while progressive discipline is typically used, especially with regards to initial offenses, the Bureau of Prisons Table of Penalties specifically states that it's not necessary where that conduct is especially serious or egregious. And this was one of those situations in which Warden Pastrana made the determination. This is really what strikes me. If there was no warning that this is just not permitted, cut it out, don't do it anymore. Unless there is something so explicit in the instructions for this position that you should not interact, there's a boundary beyond which one is prohibited from crossing in terms of the relationship when it's understood that it is part of the process of incarceration that there is a certain relationship between the government and the prisoner. And that's why I was thinking about the penalty. Had there been a rigorous warning even accepting that Sarhan showed no remorse because he thought he had done nothing wrong upon being told you're wrong, that you have seriously erred, don't do it anymore, but that apparently didn't happen. Is that right? That is correct, Your Honor. But in response, I would say there was no rigorous warning with regards to Mr. Sarhan's specific conduct. But again, there was repeated training in these constant program statements that were being issued and that Mr. Sarhan does not deny he received. In fact, he testified that he received one in 2004. He signed for receipt of another one in 2005. That set out the conduct that is and is not allowed by employees at the Bureau of Prisons. Now, whether or not that statement says you shall not receive legal advice with regards to outside situations that you may have from legal... Well, it doesn't have to be that specific in terms of receiving some sort of benefit in an interaction. That is specifically set forth in the program statement, as is this idea that you should not be engaged in any sort of improper relationship with an inmate. Now, this relationship with Mr. Davidovich in which Mr. Davidovich was providing some sort of legal advice to Mr. Sarhan and apparently in return Mr. Sarhan was providing favors back to Mr. Davidovich, won this phone call to this letter, is exactly the type of improper relationship I would argue that the program statement refers. So whether or not there was an explicit warning or a specific warning against this type of conduct, there were repeated general instructions that the type of conduct Mr. Sarhan was engaged in was inappropriate and improper. Although it seemed fairly clear that he didn't know it was inappropriate and improper at the time. That is his testimony, Your Honor. Again, and with regards to his testimony and his statements that he didn't believe he did anything wrong or that he wasn't receiving any sort of favors or quid pro quo between him and Mr. Davidovich, all of that testimony, Your Honor, has been deemed, was deemed not credible by the administrative judge. Was Mr. Sarhan been arguing lack of evidence or did he also argue that the penalty was excessive and the Douglas factors weren't followed? Well, Your Honor, he makes a sort of general argument that the Douglas factors were not appropriately followed and that they were excessive. And he does list out all of them and basically argue what his belief was with regards to how they should have been applied. But again, Warden Pastrana very clearly testified as to his consideration of those factors and the relevant factors that he's considered, that he considered. And this Court has repeatedly stated that it's the agency that's in the best position to make a determination as to an appropriate penalty and what sort of penalty would promote the efficiency of service. But the Douglas factor about potential for rehabilitation, I gather, wasn't considered or discussed by the agency. Actually, Your Honor, Warden Pastrana testified that he did not think that Mr. Sarhan was capable of being rehabilitated given his sort of adamant refusal to even accept that his actions were inappropriate. And that's in Warden Pastrana's testimony before the administrative judge. For these reasons, we respectfully request that you affirm the decision of the MSPB. Thank you. Thank you, Your Honor. Mr. Wright. Thank you, Your Honor. Just a few points. One I did not get to cover in my initial argument was this issue of twin deciding officials and the difficulty that it put upon me in the particular hearing when at the very end, Mr. Warden Pastrana says essentially he didn't decide whether there was culpability, he just applied the Douglas factors. And laying it back to Lieutenant Wensler, who had these nine separate charges, only eight of which were sustained, and in Warden Pastrana's letter purporting to decide, sustained six charges, only two of which were consistent with Mr. Wensler's. There was a general sense that there was some similarity and the fact patterns were the same, but there were two decision makers. And the administrative judge actually prodded Warden Pastrana and said, look, you seem to say you were not the deciding official. And Warden Pastrana could not be rehabilitated. He said, no, I didn't decide that. He didn't make his own independent determination based on the evidence. And this is a problem. I mean, the appearance, not just the appearance, the substance of due process, not necessarily a full-blown evidentiary hearing as the case law says, but at least a reasonable due process, an opportunity to persuade the decision maker that there may be disputed facts. That was not given to him. And if we talk about what Warden Pastrana did do, as Mr. Vorhai indicates, he did say he considered the factors. That was it. It was one sentence. He conclusively stated that he considered those factors. In reality, he didn't. He didn't write anything down. He didn't maintain a checklist or articulate them in any way. That may be the entire extent of his involvement according to his disowning the decision making of whether the charges were sustained by the investigator. So there's a significant problem with that. There's the appearance of it. And when we talk about the word egregious, so egregious so as to deprive this 13-year-old, 13-year veteran employee of his livelihood, you want to be able to articulate what was egregious. And what we have is an unarticulated favor, an unvalued favor, and an investigator who didn't even ask, and Pastrana who didn't even ask. They just assumed. In fact, I backed Pastrana into a corner. When I asked him whether or not he would apologize for something he hadn't done. So those pile-on charges of lack of candor and not showing remorse for something you didn't do, well, how can you? The warden said himself if he didn't do something, he wouldn't apologize for it. But Mr. Sarhan did express remorse for the phone call. He didn't think that it was wrong. And Judge Vitaris' attempt to say that it was wrong when he cited to a program statement regarding serious illnesses, he was wrong. That phone call wasn't to communicate a serious illness. That program statement didn't fit. And the witness, Bonet, his supervisor, testified to the same. So Judge Vitaris got it wrong. He was just playing wrong in his statement. And I pointed out a couple of other instances in which he mischaracterized Lieutenant Wenzel's testimony. And those appear at pages 9 and 15 of the reply brief. I want to hit a couple other points that I don't think were fairly addressed. The annoyingly de minimis reference was to M.D. Bureau of Prisons, Robert Sarhan, M.D., M.D., M.D. saying that somehow this is some tremendous sin that he cannot use the credential that he gained from medical school. Mr. Sarhan went to medical school, correct? Yes. Graduated, had a degree. Has he been admitted by a state to practice medicine? He did not get certified in Florida, no. Is that the equivalent for a doctor of an attorney being admitted to the bar? Yes. But he can't even take a physician assistant. That's like a paralegal or a nursing type of degree. He can't even take that because of his advanced degree. I think the last point that I wanted to make was in relation to Judge Newman's expressions regarding progressive discipline. He expressed the appropriate remorse for the caring phone call, the 15-second, not two- or three-minute phone call that he made to the inmate's mother. He did not say anything more than that, and he did not think that he was doing anything wrong, because he indicated that he had seen others not only make telephone calls on behalf of prisoners, but also write letters. He did not think he was doing anything wrong. I would respectfully suggest that this Court dignify Justice Marshall's concurrence in the Cleveland NLRB case where he says that it is devastating to be deprived of a paycheck, and that aspect should be considered. They went too far too fast in depriving him of his livelihood, and I would respectfully urge this Court to reverse what the MSPB has decided. Thank you. Thank you, Mr. Reiner. The case is taken under submission. That concludes the morning's arguments. All rise. Thank you.